1          UNITED STATES DISTRICT COURT
2           DISTRICT OF PUERTO RICO

3  LUIS CABRERA,

4

5       Plaintiff,                    Civil No. 08-1325 (JAF)

6       v.

7  SEARS ROEBUCK DE PUERTO RICO,
8  INC., et al.,

9

10      Defendants.

11                    **OPINION AND ORDER**

12      Plaintiff Luis Cabrera brings this action against Defendants

13  Sears Roebuck de Puerto Rico Inc. ("Sears") and Sears Holding

14  Group alleging violations of the Americans with Disabilities Act

15  ("ADA"), 42 U.S.C. §§ 12101-12213, and Act No. 44, of July 2,

16  1985, 1 L.P.R.A. § 501-511b (2008) ("Law 44"); Act No. 115, of

17  December 20, 1991, 29 L.P.R.A. § 194-194b (2001) ("Law 115"); and

18  Act No. 80, of May 30, 1976, 29 L.P.R.A. § 185a-185m (2001 &

19  Supp. 2007) ("Law 80"), under Puerto Rico law. (Docket No. 12.)

20  Defendants move for summary judgment. (Docket No. 29.) Plaintiff

21  opposes (Docket No. 40), Defendants reply (Docket No. 50), and

22  Plaintiff surreplies (Docket No. 54).

Civil No. 08-1325 (JAF)                                           -2-

1                                    I.

2                    **Factual and Procedural Synopsis**

3        We derive the following facts from the parties' motions,

4    statements of uncontested facts, and exhibits. (Docket Nos. 29,

5    30, 35, 38, 40, 49, 50, 53, 54, 60.)

6        Plaintiff began working at Sears on December 14, 1999, as a

7    materials handler in the Sears Retail and Distribution Center

8    ("RDC") in Cupey, Puerto Rico. From 2003 to 2006, Plaintiff

9    operated a cherry picker machine in a RDC warehouse picking and

10   retrieving stocked merchandise. This required Plaintiff to lift

11   himself up to fifteen-and-a-half feet in the air with the machine

12   to take merchandise off the warehouse shelves.

13       During Plaintiff's employment, Sears had a code of business

14   conduct and a workplace policy prohibiting violence and threats.

15   Sears issued notices to Plaintiff several times during his

16   employment for alleged violations of the policy.

17       On October 23, 2001, Plaintiff received an Ethics/Policy

18   Violation Notice from a supervisor regarding an incident on

19   August 29, 2001, with a co-worker, Iván Molina. The notice

20   provides no details of the incident. Sears later terminated

21   Molina's employment.

1      On April 11, 2006, RDC Operations Manager Gregory Rivera and

2   District Logistics Manager Abner Román met with Plaintiff and a

3   co-worker to discuss an incident that had occurred between them

4   on February 9, 2006. The nature of the incident is not documented

5   and is disputed by the parties.

6      In February 2006, Dr. Evelio Bravo Fernández ("Bravo")

7   diagnosed Plaintiff with Hepatitis C. On May 4, 2006, Plaintiff

8   verbally requested reassignment to another position due to

9   anticipated physical and emotional changes resulting from a

10  medical treatment he was about to begin. On May 9, 2006, Bravo

11  submitted a Health Care Provider Certification ("HCPC") to Sears

12  stating that Plaintiff was limited in his ability to perform

13  manual tasks, specifically heavy lifting, exposure to heights,

14  and use of stairs. Bravo indicated that the expected duration of

15  the treatment would be forty-eight to fifty weeks, and that

16  Plaintiff would require reassignment to another position and a

17  modified work schedule. Bravo also checked "yes" in response to

18  the question, "Do you believe your patient poses an imminent and

19  substantial degree of risk to [his] health or safety or to the

20  health and safety of others if [he] worked in the described

21  position?" (hereinafter the "risk assessment question"). Bravo

22  explained that Plaintiff "[m]ay fall or get accident prone."

1   (Docket No. 29-20.) Prior to beginning treatment, Plaintiff was

2   asymptomatic and able to perform the essential functions of his

3   job without limitation.

4        Plaintiff began treatment on May 26, 2006; he took a leave

5   of absence around this time for three to four weeks. As a result

6   of   the   treatment,   Plaintiff   suffered   muscular   pain,

7   cerebrovascular problems, diarrhea, stomach problems, dizziness,

8   depression,  hair  loss,  weight  loss,  irritability,  fatigue,

9   anemia, insomnia, memory loss, difficulty with coordination of

10  movement, and weakness. Upon his return to work, Sears assigned

11  Plaintiff to stock merchandise using a Hyster machine, which did

12  not expose Plaintiff to heights or heavy lifting and allowed him

13  to remain seated.

14     On  August  29,  2006,  Sears  issued  a  Documentation  of

15  Performance Issues ("DPI"), which described an incident in June

16  2006 between Plaintiff and his supervisor Miguel Paca, during

17  which  Plaintiff  allegedly  threatened  Paca  and  used  obscene

18  language. The document advised Plaintiff that it was not the

19  first time he had been involved in an argument or altercation at

20  work. Plaintiff denies that the incident occurred.

21     In December 2006, Plaintiff filed a complaint with Puerto

22  Rico's Occupational Safety and Health Administration ("PROSHA")

1    to report safety concerns at Sears. On December 14, 2006, PROSHA

2    sent Sears a letter regarding the situation; the letter did not

3    identify the complainant.  PROSHA later notified Plaintiff that

4    Sears had resolved the safety concerns.

5        On January 4, 2007, Plaintiff received a DPI notifying him

6    that on November 30, 2006, he had violated the workplace violence

7    policy by engaging in a verbal altercation with a co-worker in

8    front of other co-workers. Plaintiff noted on the form that he

9    had reported the incident on November 30, 2006.  Plaintiff's

10   earlier report stated that the co-worker had instigated the

11   incident and threatened Plaintiff.

12       In April or May 2007, Bravo informed Plaintiff that the

13   treatment had not been successful and would need to continue. On

14   May 8, 2007, Plaintiff submitted another HCPC from Bravo

15   requesting accommodations.  The form reported limitations in

16   Plaintiff's ability to perform manual tasks, specifically heavy

17   lifting, exposure to heights, and using stairs. Bravo indicated

18   that he expected the condition to last forty-eight weeks, and

19   that Plaintiff required reassignment to another position and a

20   modified work schedule that did not require work on Saturdays.

21   Bravo again checked "yes" in response to the risk assessment

22   question and noted that Plaintiff "[m]ay fall or get accident

1   prone. Emotional liability [second] to his treatment." (Docket
2   No. 29-28.)

3        Associate Relations Manager Sunny González contacted Sears'
4   Accommodation Help Desk in Chicago on May 25, 2007, for
5   assistance in handling Plaintiff's request for accommodation. On
6   March 31, 2007, Román and Human Resources Specialist Jennifer
7   Vega spoke with Jean Barlett, Sears' fair employment and
8   accommodation consultant, who directed them to ask Plaintiff's
9   doctor whether Plaintiff could continue working with the
10  accommodations he had already been given.  If the information was
11  unclear, Sears would hire an independent doctor, and would put
12  Plaintiff on leave for the duration of his treatment if he could
13  not work in any available position. On June 28, 2007, González
14  requested that Plaintiff submit additional medical information
15  in order to evaluate his request for reasonable accommodation.
16  The same day, González sent an email with a Performance Plan for
17  Improvement to Román to discuss with Plaintiff, and stated that
18  "we understand that this is not the time to fire him." (Docket
19  No. 53-11.) González asked Román to explain to Plaintiff that
20  this would be his last chance.

21       On June 15, 2007, PROSHA again notified Sears that it had
22  received a notice of an alleged health and safety risk,

1    specifically that the batteries of their lifts were defective and

2    released acid and smells that affected employees; the notice did

3    not identify the complainant. On June 27, 2007, Plaintiff

4    complained to Vega that the Hyster machine's battery was leaking

5    acid and emitting a strong odor.  Vega and others later visited

6    the machine but discovered no odor.

7        On July 3, 2007, PROSHA wrote to Plaintiff acknowledging a

8    complaint he had filed about safety concerns at Sears. The same

9    day, PROSHA wrote to Román informing him of a complaint of

10   stagnant water and defective ramps at Sears; the letter did not

11   identify the complainant.

12       On July 4, 2007, Plaintiff received another DPI listing

13   seven occasions on which he had been disrespectful or threatening

14   toward supervisors or coworkers, including a June 27, 2007,

15   incident in which Plaintiff allegedly yelled at Vega and other

16   supervisors in front of coworkers.

17       Plaintiff submitted a third HCPC from Bravo on July 10,

18   2007.  Bravo stated that Plaintiff had been diagnosed with

19   depression and anemia, was limited in several major life

20   activities, and suffered from insomnia, loss of memory, muscle

21   pain, irritability, and lack of stamina and strength. He wrote

22   that he expected the condition to last seventy-two weeks and that

1    Plaintiff could not perform heavy lifting or be exposed to

2    heights. Bravo clarified in response to the risk assessment

3    question that Plaintiff was at risk for "trauma due to falls and

4    could get hurt or have accident[s] due to his weakness. He is not

5    a risk to the health of others." (Docket No. 29-34.)

6        González, Vega, and Román met with Plaintiff on July 24,

7    2007.  At the meeting, Plaintiff executed a medical release so

8    Sears could speak directly with his doctors regarding his

9    limitations and required accommodations. The supervisors also

10   informed Plaintiff that he would be suspended from work pending

11   clarification of the information in the HCPC. During the

12   suspension, Plaintiff received short-term disability payments of

13   seventy percent of his salary.

14       On July 30, 2007, González spoke by telephone with Bravo,

15   who confirmed that Plaintiff could do his job with the provided

16   accommodations, that he would simply have to work more slowly and

17   carefully due to his weakness and lack of agility, that his

18   irritability and aggressiveness were a result of the treatment

19   but that it was not likely to rise to the level of violence, and

20   that the treatment would last at most five to six months more.

21   Bravo also stated that he had referred Plaintiff to a

22   psychiatrist to deal with his changes in mood.

1      At González' request, Plaintiff executed a medical release

2    form for her to speak with his psychiatrist, Dr. Brignoni

3    ("Brignoni"), on August 2, 2007. On August 6, 2007, Plaintiff

4    brought González a letter from Brignoni certifying that

5    Plaintiff's emotional condition was stable and did not prevent

6    or interfere with his work, but she did not accept the letter.

7    Later that day, González spoke by telephone with Brignoni, who

8    stated that he would not comment until González put Sears'

9    specific concerns in writing. On August 9, 2007, González sent

10   Brignoni a five-page letter detailing Plaintiff's alleged

11   problems at work.

12      On August 14, 2007, Sears received notice that Plaintiff had

13   filed a charge of disability discrimination with the Equal

14   Employment Opportunity Commission ("EEOC") on July 25, 2007.

15      On August 15, 2007, Brignoni sent Sears a medical

16   certificate stating that Plaintiff could return to work and

17   "resume his full-time tasks." (Docket No. 29-44.) The same day,

18   Sears informed Plaintiff that he could return to work. Plaintiff

19   returned to work on August 16, 2007, and continued working with

20   the Hyster machine accommodation. That day, González asked

21   Ricardo Miranda, Plaintiff's supervisor, to assist her in

Civil No. 08-1325 (JAF)                                                    -10-

1    ensuring that Plaintiff satisfactorily performed his work without

2    creating problems for coworkers or supervisors.

3        On October 5, 2007, an anonymous caller contacted a Sears

4    ethics hotline to report that Plaintiff frequently disrespected

5    coworkers and supervisors, instigated arguments, and created

6    tension and anxiety in the workplace. The caller could not

7    provide specific examples of such behavior.

8        On October 10, 2007, Plaintiff drafted a statement detailing

9    an interview he had had with police agents who were investigating

10   thefts at RDC. Plaintiff implicated certain Sears supervisors and

11   managers as responsible for the thefts. Plaintiff alleges that

12   he informed Vega of these facts and allegations on November 8,

13   2007.

14       On November 8, 2007, Paca called the ethics hotline and

15   reported that Plaintiff had disrespected him that day and on

16   three prior occasions; Paca claimed to have made prior reports

17   without effect.  The same day, Paca wrote a report detailing the

18   incident and the verbal exchange with Plaintiff. Plaintiff denies

19   Paca's account.

20       Sears terminated Plaintiff on November 9, 2007.  Plaintiff

21   filed a second charge of discrimination with the EEOC on November

22   13, 2007.

1        Plaintiff filed the present action in federal district court

2   on March 14, 2008. (Docket Nos. 1, 12.) Defendant moved for

3   summary judgment on April 24, 2009. (Docket No. 29.) Plaintiff

4   opposed on May 18, 2009 (Docket No. 40), Defendant replied on May

5   29, 2009 (Docket No. 49), and Plaintiff surreplied on June 9,

6   2009 (Docket No. 54).

7                                 **II.**

8            **Summary Judgment Standard Under Rule 56(c)**

9        We grant a motion for summary judgment "if the pleadings,

10   the  discovery  and  disclosure  materials  on  file,  and  any

11   affidavits show that there is no genuine issue as to any material

12   fact and the movant is entitled to judgment as a matter of law."

13   Fed. R. Civ. P. 56(c).  A factual dispute is "genuine" if it

14   could be resolved in favor of either party, and "material" if it

15   potentially affects the outcome of the case. Calero-Cerezo v.

16   U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  The

17   moving party carries the burden of establishing that there is no

18   genuine issue as to any material fact; however, the burden "may

19   be discharged by showing that there is an absence of evidence to

20   support the nonmoving party's case." Celotex Corp. v. Catrett,

21   477 U.S. 317, 325, 331 (1986). The burden has two components:

1    (1) an initial burden of production, which shifts to the

2    nonmoving party if satisfied by the moving party; and (2) an

3    ultimate burden of persuasion, which always remains on the moving

4    party. Id. at 331.

5        In evaluating a motion for summary judgment, we must view

6    the record in the light most favorable to the non-moving party.

7    Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). However,

8    the non-moving party "may not rely merely on allegations or

9    denials in its own pleading; rather, its response must . . . set

10   out specific facts showing a genuine issue for trial."  Fed. R.

11   Civ. P. 56(e)(2).

12                              **III.**

13                            **Analysis**

14   **A.   ADA Claims**

15        **1.   Disability Discrimination**

16        Defendants argue, inter alia, that Plaintiff is not a

17   qualified individual with a disability under the ADA because he

18   was unable to perform the essential functions of his job, picking

19   and retrieving stocked merchandise. (Docket No. 30.) The parties

20   dispute whether "picking and retrieving" merchandise was an

21   essential function of Plaintiff's job. (See Docket Nos. 30, 40.)

1      The ADA prohibits discrimination against a "qualified

2  individual with a disability because of the disability of such

3  individual in regard to . . . discharge . . . and other terms,

4  conditions, and privileges of employment." 42 U.S.C. § 12112(a).

5  To establish a claim for an adverse employment action under the

6  ADA, a plaintiff must prove that he was (1) disabled under the

7  ADA, but (2) "able to perform, with or without reasonable

8  accommodation, the essential functions of her job," and (3)

9  "discharged or adversely affected, in whole or in part, because

10  of her disability." Orta-Castro v. Merck, Sharp & Dohme Quimica

11  P.R., Inc., 447 F.3d 105, 111 (1st Cir. 2006).

12      A qualified individual under the ADA is one "able to perform

13  the essential functions of the position with or without

14  reasonable accommodation." Ward v. Mass. Health Research Inst.,

15  Inc., 209 F.3d 29, 33 (1st Cir. 2000). An "essential function"

16  is a "fundamental job dut[y] of the employment position the

17  individual with the disability holds or desires." 29 C.F.R. §

18  1630.2(n)(1). To determine whether a particular job requirement

19  is an essential function, a court must conduct a fact-intensive

20  inquiry and consider numerous factors, including (1) the

21  employer's view of job requirements; (2) written job descriptions

22  prepared prior to hiring; (3) the length of time spent performing

1   this function; (4) the consequences of not requiring the

2   function; (5) work experience of past incumbents in the job; and

3   (6) work experience of current incumbents in similar positions.

4   See C.F.R. § 1630.2(n)(3); see also Ward, 209 F.3d at 34-35. The

5   employer, who is better positioned to produce the relevant

6   evidence, bears the burden of demonstrating that a given job

7   function is essential. See Ward, 209 F.3d at 35 (citations

8   omitted). "[E]vidence that accommodations were made so that an

9   employee could avoid a particular task 'merely shows the job

10  could be restructured, not that [the function] was non-

11  essential.'" Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st

12  Cir. 2001) (quoting Basith v. Cook County, 241 F.3d 919, 930 (7th

13  Cir. 2001)).

14      Defendants have produced a written job description for the

15  warehouse material handler position, which includes "stock[ing]

16  and pick[ing] merchandise" on a list of essential job functions.

17  (Docket No. 29-5.) Vega testified that Sears provided the job

18  description to all new employees upon hiring, and later if

19  requested. (Docket No. 35-2.) She further explained that the job

20  description does not change unless the position is changed. (Id.)

21  González testified that while at any given time a warehouse

22  material handler might not be required to perform all of the

1    listed functions, he or she could be called upon at any time to

2    perform those functions depending on Sears's needs. (Docket Nos.

3    35-5, 35-6.) Accordingly, Sears required that employees in that

4    position be capable of performing all of the described functions.

5    (See id.)

6         Plaintiff testified that, prior to his treatment and since

7    he began working in the warehouse in 2003, his job consisted of

8    picking and retrieving merchandise using a cherry picker and

9    manually loading pallets. (Docket No. 35-4.) In May 2006,

10   Plaintiff submitted a form completed by Bravo requesting a

11   reasonable accommodation involving a reassignment to another

12   position that did not require him to lift heavy objects or be

13   exposed to heights. (Docket No. 29-20.)  Plaintiff does not

14   dispute that he was unable to perform the task of picking and

15   retrieving merchandise once he began treatment. Instead, Sears

16   allowed him to stock merchandise using a Hyster machine which

17   lifts pallets up and places them on the upper shelves of the

18   warehouse while the operator remains seated. (Docket No. 35-4.)

19        Plaintiff does not suggest what he believes are the

20   essential functions of his position, offer any evidence to rebut

21   Sears' evidence demonstrating that picking is an essential

22   function, or argue that he was capable, with or without

1    accommodation, of picking and retrieving merchandise. Plaintiff's

2    arguments that Defendant's evidence is contradictory are

3    unavailing. (See Docket No. 40.)  Beyond these assertions,

4    Plaintiff claims only that, because Sears allowed him to stock

5    merchandise rather than pick and retrieve merchandise during his

6    treatment, his job could be restructured. (See id.) However, the

7    First Circuit rejected this argument in Phelps. See 251 F.3d at

8    26.  The fact that Sears restructured Plaintiff's job to

9    accommodate his treatment does not prove that picking and

10   retrieving merchandise was not an essential function. Cf. id.

11   Without any other evidence, Plaintiff has failed to show a

12   triable issue of fact regarding his essential job functions.

13   Accordingly, Plaintiff is not a qualified individual under the

14   ADA, see Ward, 209 F.3d at 33, and we must grant summary judgment

15   for Defendants on Plaintiff's ADA disability discrimination

16   claims. As we grant summary judgment for Defendants on this

17   ground, we need not address their other arguments regarding

18   disability discrimination.

19        **2.  <u>Failure to Accommodate</u>**

20        Defendants argue that they are entitled to summary judgment

21   on Plaintiff's failure to accommodate claim because Sears in fact

22   provided Plaintiff with the accommodation he requested. (Docket

1    No. 30.) Plaintiff does not dispute Defendants' motion for

2    summary judgment on this issue and, in fact, concedes that he

3    received a reasonable accommodation during his treatment.

4    (See Docket No. 40.)  We, therefore, grant summary judgment in

5    favor of Defendants on Plaintiff's failure to accommodate claim.

6    **3.   Retaliation**

7    The ADA prohibits retaliation "against any individual

8    because such individual has opposed any act or practice made

9    unlawful by this chapter." 42 U.S.C. § 12203(a). "An ADA

10    plaintiff may assert a claim for retaliation even if [he] fails

11    to succeed on a disability claim." Freadman v. Metro. Prop. &

12    Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007). In the absence

13    of direct evidence, as here, a plaintiff must make a prima facie

14    showing of retaliation by showing that (1) he engaged in

15    protected conduct, (2) he suffered an adverse employment action,

16    and (3) there was a causal connection between the protected

17    conduct and the adverse employment action. See Wright v. CompUSA,

18    Inc., 352 F.3d 472, 478 (1st Cir. 2003). In some circumstances,

19    "the causation element may be established by evidence that there

20    was a temporal proximity between" the protected conduct and the

Civil No. 08-1325 (JAF)                                            -18-

1    employment action. Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st

2    Cir. 2007).

3        Once a plaintiff establishes the prima-facie case, "the

4    burden shifts to the employer 'to articulate a legitimate,

5    nondiscriminatory reason for its employment decision.'" Wright,

6    352 F.3d at 478  (quoting Mesnick v. Gen. Elec. Co., 950 F.2d

7    816, 827 (1st Cir. 1991)). If the employer does so, the burden

8    shifts back to the plaintiff to show that the proffered reason

9    is mere pretext for retaliation. Id. "[W]here a plaintiff . . .

10   makes out a prima facie case and the issue becomes whether the

11   employer's stated nondiscriminatory reason is a pretext for

12   discrimination, courts must be particularly cautious about

13   granting the employer's motion for summary judgment." Billings

14   v. Town of Grafton, 515 F.3d 39, 55-56 (1st Cir. 2008) (quoting

15   Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st Cir.

16   1998)).

17       Requesting an accommodation constitutes protected conduct

18   under the ADA's retaliation provision. Freadman, 484 F.3d at 106.

19   It is undisputed that Sears suspended and later discharged

20   Plaintiff, and that these constituted adverse employment actions.

21   We consider the suspension and the termination in turn.

1        **a.   <u>Suspension</u>**

2        Defendants argue that Plaintiff has failed to show a causal

3   connection between his protected conduct and the suspension.

4   (Docket No. 30.) Plaintiff submitted HCPCs requesting reasonable

5   accommodations on May 8, 2007, and July 10, 2007. Sears suspended

6   Plaintiff shortly thereafter on July 24, 2007. Moreover, it is

7   undisputed that Plaintiff's supervisors informed him that he was

8   being suspended so that they could clarify information in his

9   reasonable accommodation request. We find that the temporal

10  proximity between Plaintiff's requests, coupled with this

11  admission by his supervisors, is sufficient evidence for a

12  reasonable jury to find a causal connection between the requests

13  and the suspension.

14       Defendants do not articulate a justification for Plaintiff's

15  suspension in response to his claim for retaliation. (<u>See</u> Docket

16  Nos. 30, 50.) Nonetheless, we consider the reason articulated by

17  Defendants in response to Plaintiff's disability discrimination

18  claims. (<u>See</u> Docket No. 30.) Defendants state that they suspended

19  Plaintiff in order to evaluate whether his emotional condition

20  made him a threat to others due to the irritability and

21  "emotional liability" Bravo noted on the May 2007 HCPC, and

1    because of Bravo's affirmative notations on the HCPCs related to

2    the risk assessment question. (Docket No. 30; <u>see</u> Docket Nos. 29-

3    20, 29-28.)

4         Drawing all inferences in Plaintiff's favor, however, we

5    believe a jury could find this assertion to be pretext. First,

6    the HCPC form links the risk assessment question to an attached

7    description of the patient's present position. (<u>See</u> <u>id.</u>) In other

8    words, the form appears to ask only whether the individual poses

9    a risk in his current position, and Bravo's notations suggest

10   that Plaintiff would not pose the potential risk with the

11   accommodations requested. For example, Plaintiff would not be at

12   risk for falling if he was not exposed to heights.

13        Second, as Plaintiff notes, Defendants did not suspend him

14   after he submitted the May 2006 form containing Bravo's

15   affirmative response to the risk assessment question (Docket No.

16   29-20), nor did Defendants choose to suspend him after Bravo

17   wrote that he could be a risk due to "emotional liability" on the

18   May 2007 form (Docket No. 29-28). It was not until after Bravo

19   clarified that Plaintiff was <u>not</u> a risk to others on the July

20   2007 form (Docket No. 29-32) that Defendants suspended Plaintiff

21   to allegedly investigate the risk posed by his emotional state.

22   We agree with Plaintiff that these discrepancies raise a triable

1    issue of fact as to whether his suspension was motivated by

2    retaliation. See Billings, 515 F.3d at 55-56 ("One way to show

3    pretext is through 'such weaknesses, implausibilities,

4    inconsistencies, incoherencies, or contradictions in the

5    employer's proffered legitimate reasons for its action that a

6    reasonable factfinder could rationally find them unworthy of

7    credence . . . .'" (quoting Hodgens, 144 F.3d at 168)).

8         **b.   Discharge**

9         Defendants argue that Plaintiff has failed to point to any

10   evidence suggesting a causal connection between his EEOC charge

11   and his discharge. (Docket No. 30.)

12        Defendants became aware that Plaintiff had filed the EEOC

13   charge on August 15, 2007, but the discharge did not occur until

14   nearly four months later, on November 8, 2007. Plaintiff, thus,

15   cannot rely on temporal proximity to create an inference of

16   causation, see Calero-Cerezo, 355 F.3d at 25, and he has

17   suggested no other theories supporting such an inference.

18        Plaintiff seems to assert that the fact that most of the

19   reprimands he received took place after his first request for

20   reasonable accommodation shows that the reprimands and the

21   ultimate discharge were all motivated by retaliatory animus. (See

1    Docket   No.   40.)   While   it   is   true   that   "[e]vidence   of

2    discriminatory or disparate treatment in the time period between

3    the  protected  activity  and  the  adverse  employment  action  can

4    . . . show a causal connection," <u>Chunqchi Che v. Mass. Bay Trans.</u>

5    <u>Auth.</u>, 342 F.3d 31, 38 (1st Cir. 2003), Plaintiff fails to point

6    to any evidence that the reprimands reflect some discriminatory

7    animus or disparate treatment.  Without more, we cannot find that

8    there  was  a  causal  nexus  between  Plaintiff's  requests  for

9    accommodation or EEOC charge and his discharge.

10   **B.**   **<u>Law 44</u>**

11        Because Law 44 is coterminous with the ADA's discrimination

12   and  reasonable  accommodation  provisions,  our  reasoning  above

13   applies to Plaintiff's claims for disability discrimination under

14   Law 44, and we grant summary judgment for Defendants on these

15   claims. <u>See</u> <u>Ruiz Rivera v. Pfizer Pharms., LLC</u>, 521 F.3d 76, 87

16   (1st Cir. 2008).

17   **C.**   **<u>Law 115</u>**

18        Law 115 provides that an employer may not discriminate

19   against an employee for offering or attempting to offer "any

20   testimony,  expression  or  information  before  a  legislative,

21   administrative or judicial forum." 29 L.P.R.A. § 194a. Law 115

1    does not prohibit retaliation in response to internal complaints,

2    only offerings to a judicial forum. Id.; Hoyos v. Telecorp

3    Commc'ns., 405 F. Supp. 2d 199, 207 (D.P.R. 2005). To prove

4    liability under Law 115, an employee must first establish a

5    prima-facie case by showing that she participated in a protected

6    activity and was subsequently discharged. 29 L.P.R.A. § 194a(c).

7    Next, the employer must offer a legitimate, non-discriminatory

8    reason for the discharge. Id. Finally, the plaintiff may prevail

9    by demonstrating that the alleged reason is a "mere pretext for

10   the discharge." Id.

11       Defendants do not dispute that filing a charge with the

12   EEOC, filing a complaint with PROSHA, and offering testimony to

13   the police in a criminal investigation constitute protected

14   activity. It is further undisputed that Defendants discharged

15   Plaintiff. These facts establish Plaintiff's prima-facie case.

16   See 29 L.P.R.A. § 194a(c).

17       Defendants have stated that Plaintiff's discharge was a

18   result of repeated reprimands he received for acts of

19   insubordination and threats towards his supervisors and

20   coworkers. To show pretext, Plaintiff has introduced evidence

21   challenging the truth of the reprimands and the factual scenarios

22   involved in the alleged incidents.

1    Plaintiff has failed to show that the reprimands constituted

2    pretext for retaliation on the basis of his PROSHA complaints

3    because the evidence he has introduced does not demonstrate

4    causation. (See Docket Nos. 38, 40.)  Plaintiff apparently filed

5    two complaints with PROSHA regarding safety concerns at Sears,

6    but the letters from PROSHA to Sears and to Plaintiff show that

7    Plaintiff's identity as a complainant was kept confidential.

8    Plaintiff, therefore, cannot show that Defendants knew he had

9    filed the complaints.

10    Plaintiff has also failed to show causation arising from his

11    EEOC charge. Defendants became aware Plaintiff had filed the

12    charge on August 14, 2007, but he was not discharged until nearly

13    four months later. Plaintiff has not pointed to any evidence

14    suggesting a causal connection between these events, or that the

15    discharge was motivated by his filing of the charge.

16    On the other hand, Plaintiff has introduced evidence that he

17    provided testimony to the police in a criminal investigation less

18    than one month before his termination, and that he informed Vega

19    of his allegations the day before Defendants discharged him. We

20    find that, if proven at trial, a reasonable jury could determine

21    that this very close proximity, combined with Plaintiff's

1    challenges to Defendant's proffered reason for the discharge,

2    demonstrate pretext for retaliation.

3    **D.   <u>Law 80</u>**

4         Law 80, Puerto Rico's wrongful termination statute, entitles

5    an employee discharged from employment without just cause to

6    severance pay from his former employer. 29 L.P.R.A. § 185a. Under

7    Law 80, an employee bears the initial burden of alleging

8    unjustified dismissal and proving actual dismissal. <u>Álvarez</u>

9    <u>Fonseca v. Pepsi Cola of P.R.</u>, 152 F.3d 17, 28 (1st Cir. 1998).

10   Once the employee does so, the burden shifts to the employer to

11   prove that it discharged the employee for just cause.  <u>Id.</u>

12        It is undisputed that Defendants terminated Plaintiff from

13   his employment with Sears. Defendants submit evidence of multiple

14   examples of occasions where Plaintiff received reprimands for

15   insubordination and inappropriate conduct in the workplace.

16   Plaintiff, in response, proffers testimony and evidence

17   challenging most of these reprimands as unwarranted or falsified,

18   including the final incident that allegedly precipitated his

19   termination. There remain triable issues of material fact

20   regarding Plaintiff's Law 80 claims; accordingly, summary

21   judgment on this claim is unwarranted.

Civil No. 08-1325 (JAF)                                                  -26-

1                                    **IV.**

2                                **Conclusion**

3         For the reasons stated herein, we hereby **GRANT** Defendant's

4    motion for summary judgment **IN PART** and **DENY** it **IN PART** (Docket

5    No.  29).  We  **DISMISS**  Plaintiff's  claims  for  disability

6    discrimination, failure to accommodate, and retaliatory discharge

7    under the ADA, his Law 44 claims, and his Law 115 claims relating

8    to  his  EEOC  charge  and  PROSHA  complaints.   Remaining  are

9    Plaintiff's  claims  for  retaliatory  suspension  under  the  ADA,

10   retaliatory  discharge  under  Law  115  arising  from  his  testimony

11   to the Puerto Rico police, and wrongful termination under Law 80.

12   The  parties  are  strongly  encouraged  to  exhaust  all  settlement

13   possibilities before proceeding to trial.

14        **IT IS SO ORDERED.**

15        San Juan, Puerto Rico, this 10th day of August, 2009.

16                                    s/José Antonio Fusté
17                                    JOSE ANTONIO FUSTE
18                                    Chief U.S. District Judge